**OXON ITALIA, S.p.A., Plaintiff,**

v.

**FARMLAND INDUSTRIES, INC., Defendant.**

**No. 79 Civ. 0002(MEL).**

United States District Court, S. D. New York.

Aug. 3, 1982.

Trubin Sillcocks Edelman & Knapp, New York City, for plaintiff.

Haight, Gardner, Poor & Havens, New York City, for defendant; Richard M. Ziccardi, Curtis E. Pew, Keith W. Heard, New York City, of counsel.

LASKER, District Judge.

Oxon Italia, S.p.A. ("Oxon") is a manufacturer of agricultural chemicals, including atrazine, a special herbicide which Oxon produces in its "raw" or technical state. Atrazine is "formulated," or mixed with inert materials, before it is suitable for agricultural application. Oxon alleges that Farmland Industries, Inc. ("Farmland") breached its contract with Oxon by refusing to pay for five containers of technical atrazine which Oxon sold to Farmland. Oxon also claims that it is entitled to recover for the five containers under the theories of unjust enrichment and conversion. In addition, Oxon alleges that Farmland has failed to pay price increases based on currency fluctuations and increases in the costs of raw materials to Oxon as provided in the contract. Oxon seeks to recover interest it incurred in borrowings caused by all the alleged breaches. Oxon computes these damages to amount to $717,085.03.

Farmland contends that its supply contracts for atrazine were not with Oxon, but rather were with a Canadian company, Soluja Ltee ("Soluja"). While Oxon was the supplier of technical atrazine to Soluja, Farmland emphasizes that its contract with Soluja was for formulated, rather than technical, atrazine. Under its contract with

Soluja, Farmland asserts, it was unconditionally entitled to withhold payment on five containers as liquidated damages for Soluja's breach of the contract. Farmland denies that it ever agreed to pay Oxon for the five containers and asserts that Oxon's contention of an oral agreement to that effect is barred by the parol evidence rule and the Statute of Frauds. According to Farmland, the only agreements between it and Oxon were for "spot" purchases of atrazine in 1975. Farmland also contends that Oxon is not entitled to recover under the theory of unjust enrichment because Oxon has been guilty of bad faith, it has slept on its rights, and because Farmland has not been enriched, but rather has suffered substantial lost profits as a result of Soluja's failure to supply atrazine as called for in the contract. In addition, Farmland denies having ever agreed to pay Farmland for any price increases based on raw material cost or currency fluctuations.

The case has been tried to the court. Due to the complexity of the case, the matter has been under consideration for some time since trial. Since the case turns on the involved fact pattern, the facts are set forth at length below.

## I.

Many of the underlying facts are not in dispute. The relationship between the parties began in early 1973, when Jacques de Cayetti, the principal of Soluja, contacted Farmland offering to sell it atrazine. Farmland placed an initial order for 500,000 pounds of formulated atrazine in February, 1973. Subsequently, in the spring of 1973, de Cayetti escorted Richard Hutchings and Ray Barry of Farmland on a tour of the facilities of Soluja's suppliers. At that time, Soluja purchased technical atrazine from Oxon and had it formulated by Phyteurop, a French company. Farmland was not legally authorized to import the atrazine directly from these companies because it had no importation label for the products. The atrazine was therefore imported under Soluja's label.

After Farmland's personnel visited the Phyteurop and Oxon facilities, Farmland entered into a contract with Soluja on March 28, 1973, for the purchase of 18,000,000 pounds of formulated atrazine, to be delivered at specified times and purchased at specified base prices. The agreement provided that Farmland could choose to have the atrazine formulated in the United States rather than by the Phyteurop company. It also provided that after June 1, 1974, the prices specified would be indexed to the deutsche mark, and that Soluja and Farmland would exchange bank guarantees to insure performance. (Def. Exs. A and B; Tr. at 305–310) Farmland was made Soluja's exclusive United States distribution agent. Soon thereafter, Soluja and Farmland agreed that the Missouri Chemical Company, a wholly-owned subsidiary of Farmland, would formulate the technical atrazine received from Soluja. Soluja continued to sell *formulated* atrazine to Farmland itself, however.

Twenty days later, on April 17, 1973, Oxon and Soluja agreed that Oxon would sell to Soluja some 6,900 tons of technical atrazine in lots and time periods corresponding to Farmland's contract with Soluja. The agreement also provided for indexation according to the deutsche mark, and for exchange of bank guarantees. Oxon agreed not to sell atrazine in the United States except to Soluja. (Pl. Exs. 1A and 1B). In satisfaction of the obligations in the two contracts for bank guarantees, Oxon obtained a letter of credit endorsed in Farmland's favor (in satisfaction of its obligation to Soluja under its contract) and Farmland obtained a letter of credit endorsed in favor of Oxon (in satisfaction of its obligation to Soluja).

The transactions proceeded under the terms of the contracts until late 1973 or early 1974, when, due to a shortage of a constituent material resulting from the oil crisis, Oxon was unable to produce the required amounts of atrazine. A meeting was held at Farmland's Kansas City offices in April, 1974 between Farmland, Soluja, and Oxon to discuss the situation. At the meeting, Farmland's attorney served a

summons and complaint on Oxon and Soluja based on the nondelivery of the quantities of atrazine contracted for, alleging *inter alia* that Oxon had agreed to sell Farmland the product. (Tr. at 215–17; Pl. Ex. 4). Shortly thereafter, however, Farmland requested another meeting to discuss the parties' future relationships. This meeting was held on June 12, 1974, in New York City between Barry and Hutchings on behalf of Farmland, Amari and Ferraris on behalf of Oxon, and de Cayetti for Soluja.

The testimony differed as to what occurred at the June 12th meeting. According to Amari, it was orally agreed by all three parties that the previous contracts should be modified in the following respects: 1) to provide for a new price structure by which a base price would be paid by Farmland directly to Oxon, and an additional price relating to increases in raw material costs and currency indexation would be paid by Farmland to Soluja, and then by Soluja to Oxon; 2) to alter the quantities of atrazine to be shipped by Oxon; 3) to dismiss all claims and litigation arising out of prior events, and most significantly, Amari testified that the parties 4) agreed to a new security arrangement by which Farmland would retain payment for five containers on a rolling forward basis, with final payment to be made when Oxon completed performance. According to Amari, the joint agreement among the parties was to be reflected in back-to-back contracts between Soluja/Oxon and Soluja/Farmland. (Tr. at 220–23; 250–52).

Hutchings, however, testified that no such oral agreements were made between Farmland and Oxon. According to him, Farmland's sole purpose in attending the meeting was to secure a new agreement with Soluja which would assure Farmland the delivery of sufficient atrazine. Hutchings stated that Farmland's business discussions at the meeting were with de Cayetti, not with Oxon personnel, and that de Cayetti made a point of keeping his discussions with Oxon separate from his discussions with Farmland. Hutchings acknowledged that there was general discussion between Soluja, Farmland and Oxon about the prob-

lems that had arisen earlier, but denied that any three way agreement had been reached. Instead, Hutchings believed at the conclusion of the meeting that it had reached an agreement on basic principles with Soluja, and that it would finalize a contract with Soluja after Soluja worked out its arrangements with Oxon. (Tr. at 318–324).

On the same day, June 12, 1974, Oxon and Soluja reached agreement on the terms of a new contractual arrangement, embodying the changes about which Amari testified, and providing that, as a condition precedent, Soluja was to modify its contract with Farmland on "comparable terms." (Pl. Ex. 6). On June 26, 1974, in Montreal, Soluja and Farmland finalized their agreement. It corresponded to the agreement between Soluja and Oxon in most respects, with the significant exception that, while the Oxon/Soluja contract provided for Farmland to withhold payment on five containers on a rolling forward basis for the sole purpose of securing Oxon's completion of delivery, the Farmland/Soluja contract permitted Farmland to withhold payment on five containers on a rolling forward basis *and* to retain payment "as liquidated damages for the failure of Soluja to timely deliver product to Farmland." Moreover, the Farmland/Soluja agreement provided that "[i]t is expressly agreed between the parties hereto that this contract between Farmland and Soluja shall stand on its own terms and that the same is not affected by any contractual arrangements between Soluja and its supplier, Oxon, whether or not the same has been heretofore disclosed to Farmland." (Pl. Ex. 6).

Oxon began shipping atrazine within one week of the June 12th meeting, and thereafter devoted its entire production capacity to producing atrazine for ultimate purchase by Farmland. The relations between the parties proceeded smoothly until late 1974, when, as both Farmland and Oxon agree, Soluja invoked an elaborate scheme to defraud them. At that time, de Cayetti visited Oxon and said that Soluja needed a shipment of atrazine for the Canadian market to maintain its registration there. de

Cayetti assured the Oxon representatives that such a shipment would not upset relations with Farmland because Farmland did not need additional atrazine at the time. In addition, Soluja sent a letter to Oxon which purported to indicate that Barry of Farmland had received a copy. (Tr. 52; Pl. Ex. 8). Believing that Farmland had no objection, Oxon agreed to sell Soluja the requested atrazine. Meanwhile, de Cayetti had told Farmland representatives that Oxon was unable to provide the additional quantities of atrazine that Farmland wished to purchase but that Soluja could obtain additional atrazine from a Yugoslavian supplier at prices higher than the Oxon price. In need of additional atrazine, Farmland agreed to the purchase. In February, 1975, Farmland representatives met with Oxon personnel in Milan and discovered Soluja's duplicity. They agreed to keep each other informed about their dealings with Soluja and to trace the "Canadian" atrazine which Oxon was to ship to Soluja to confirm that it was the same "Yugoslavian" atrazine which Soluja was selling to Farmland. According to Brolis, it was also agreed that Farmland and Oxon would terminate their dealings with Soluja sometime in the future and deal on a direct basis. That course of action was not possible at the time because Farmland still did not possess a label for importation. Farmland and Oxon kept each other informed on the matter for the next several months and, in May, 1975, confirmed Soluja's fraud when Farmland received the "Yugoslavian" atrazine and learned from Oxon that it was the same atrazine which Oxon had sold Soluja for Canadian distribution.

Meanwhile, disagreements arose between Oxon and Soluja as to Oxon's right to price increases to reflect increases in the costs of raw materials. Under the June 12, 1974, agreement between Oxon and Soluja, Oxon was entitled to price increases of up to 7% for each of various contract periods to the extent such increases were justified by increases in the cost of raw materials to Oxon. The agreement provided that, if Oxon sought price increases greater than 7%, Soluja was entitled to reject delivery and Oxon would thereafter be relieved from its obligations under the contract. (Pl. Ex. 5). According to Oxon's witnesses, its price increases for the first contractual period exceeded 7%, but Oxon limited its price increase to Soluja to 7% at the time. However, in early 1975, Oxon informed Soluja that it would charge its actual increased cost for the following contractual period. Soluja protested the increase, complaining to Oxon that Farmland would not pay the additional cost. Oxon's witnesses testified that the subject of the increases was also discussed at the February, 1975 meeting in Milan and that the Farmland personnel indicated that Farmland did not object to paying legitimate increases to cover the cost of raw materials. Following the meeting, Oxon wrote to Farmland and substantiated its claim of greater raw material costs. (Pl. Ex. 15).

Amari testified that at the February meeting in Milan, Farmland also agreed to a plan by which Oxon would suspend shipments of atrazine for a period to ensure that Soluja did not hold shipments and make them unavailable to Farmland. Hutchings denied that Farmland had ever agreed to such a suspension. In any event, on March 7, 1975, Amari wrote to Farmland stating that, in view of the money owed to Oxon by Soluja for the disputed price increases, and the value of the containers which had already been delivered but not yet paid for, it would suspend shipments until all the containers which had already been shipped were received by Farmland. It would then make up for the delay by increasing the shipments in the following months. Farmland did not respond to the letter, and Oxon suspended shipments until June, 1975. Later in March, Oxon wrote to Farmland asking Farmland to suspend further payments to Soluja because Soluja owed Oxon for past containers.

In April, 1975, Amari and Brolis testified they met with Hutchings and Barry in Kansas City. According to Brolis, at this meeting the Farmland representatives agreed to the actions which Oxon was pursuing. Hutchings could not recall the meeting.

Amari and Brolis also testified that, on April 17, 1975, they received a call from Hutchings in which he stated that Farmland was agreeable to withholding payments from Soluja and to paying Oxon directly the amounts owed by Soluja, but that Farmland wanted written authorization to do so. Hutchings did not recall this conversation either. In any event, Oxon thereafter wrote to Farmland authorizing Farmland to withhold payments to Soluja. (Pl. Exs. 20, 21). Shortly thereafter, Oxon asked Farmland to pay directly to Oxon the money due from Soluja. (Pl. Ex. 22). Barry then called Oxon and stated that Farmland's attorneys recommended that Oxon file suit to attach the funds in order to collect from Soluja. Oxon filed such a suit in the Western District of Missouri. In that action, Farmland settled all the claims of Soluja (relating to nonpayment for the "Yugoslavian" atrazine and the five containers). Oxon's claims were dismissed for lack of subject matter jurisdiction. According to Oxon, these monies have not been paid to it either by Soluja or Farmland.

On June 4, 1975, Amari, Brolis, Barry, Hutchings and de Cayetti met in New York. According to the Oxon witnesses, the purpose of the meeting was to confront de Cayetti with his duplicity. The Farmland representatives disagreed and testified that they were merely interested in negotiating some relationship which would assure them of atrazine supply. In any event, it appears that Brolis and Amari, with the support of Farmland representatives, confronted de Cayetti with the evidence of his wrongdoing. de Cayetti subsequently left the meeting, and Barry went to meet with him to attempt to purchase his importation label. The attempt was unsuccessful. The same day, the representatives from Farmland and Oxon discussed their mutual problems. According to Hutchings, the discussions were general, and no firm agreement was made because Farmland still possessed no label for importation. (Tr. at 336; 338–40). Amari and Brolis, however, testified that at the June 4th meeting it was agreed that Oxon and Farmland would deal on a direct basis on the same terms as had previously existed, except for a simplified price structure by which the base price, the currency indexation, and the raw material cost would be reflected in a single price to Farmland. Amari and Brolis also testified that it was agreed that neither Oxon nor Farmland would deal with Soluja any longer, and that Oxon would ship directly to Farmland the atrazine it had stockpiled during its suspension of shipments, as well as the further amounts called for under the prior contracts. (Tr. at 105–111; 237–38).

The next day, Farmland sent a termination notice to Soluja. Oxon followed suit several days later. A few weeks thereafter, Farmland secured a label for the importation of atrazine, which it transmitted to Oxon on June 27, 1975. The parties had been in touch by telephone to discuss the details of their direct transactions, and at this time, according to Hutchings, an agreement was reached which is reflected in correspondence between Oxon and Farmland. (Def. Exs. R, S, T, U, V, X, Z). The correspondence includes a telex from Oxon to Farmland which refers to a telephone conversation, gives prices for 500 tons of technical atrazine, and requests a letter of credit to guarantee payment, as well as a response from Farmland that it would not agree to the letter of credit but that it will pay upon receipt. Further shipments were made pursuant to additional purchase orders from Farmland. (Def. Exs. CC, DD, EE).

In late 1975, Oxon requested that Farmland pay for all the containers which had been shipped to date, including the five containers on which Oxon then believed that Farmland was withholding payment under the 1974 agreements to ensure performance. According to the testimony of Brolis and Amari, the Farmland representatives stated that they would like to pay for the five containers then but that because of difficulties they were having with Customs authorities due to de Cayetti's misreporting of the amounts he had imported, they could not do so at the time. Hutchings denied that it was ever agreed that payment for the five containers would be made to Oxon.

In any event, in view of Oxon's need for cash, Farmland advanced Oxon $200,000 against future deliveries. (Tr. at 108; 120; 124–5; 239–40). Oxon's witnesses testified that, throughout the period leading up to the institution of this suit, Farmland assured Oxon that payment for the five containers would be forthcoming as Oxon assisted Farmland with its Customs difficulties. Hutchings testified that Farmland never agreed to pay Oxon for the containers. Farmland firmly indicated in early 1979, that it did not intend to pay Oxon for the five containers, and Oxon filed this suit two weeks later. (Tr. at 356).

## II.

Oxon's claims against Farmland rest primarily on the proposition that, at the June 12, 1974 meeting between Oxon, Farmland and Soluja, an oral agreement was reached between the parties for Oxon to sell Farmland atrazine through Soluja. Specifically, Oxon asserts that an agreement was reached for a security arrangement involving Farmland withholding payment for five containers on a rolling forward basis. Farmland's witnesses denied such an agreement and Farmland vigorously contends that in any event evidence of such an oral agreement is barred by the parol evidence rule and the statute of frauds [1] because the written contracts between the parties on their face represent totally integrated agreements.

We agree with Farmland that the parol evidence rule bars considerations of evidence of an inconsistent oral agreement in these circumstances, at least with respect to the contract claims. Oxon argues that the Farmland/Soluja contract cannot bar introduction of its evidence because it was not a party to that agreement. However, such an approach is in direct contradiction to Oxon's primary contention that the transaction was tripartite; if, as Oxon contends, the Soluja/Farmland and Soluja/Oxon agreements represent back-to-back contracts in a three-way transaction, then it would follow that the determination whether the parties' agreement was totally integrated in the writings must be made by considering both contracts together. Such an examination of the writings, even when considered along with relevant extrinsic evidence,[2] leads to the conclusion that the writings were intended to incorporate the entire agreement of the parties. However, even if, as Oxon contends, the Farmland/Soluja contract is not considered in the context of the parol evidence rule, Oxon is still left with the obstacle of the Oxon/Soluja contract. The Oxon/Soluja contract appears to represent the total, integrated agreement between Soluja and Oxon. Oxon's evidence that there was an oral agreement for a tripartite, rather than bilateral, contractual relationship, is inconsistent with the written agreement between Soluja and Oxon which establishes a bilateral relationship and therefore would be barred by the parol evidence rule. Application of the parol evidence rule in the context of this case would thus lead to the conclusion that there was no three part agreement, but rather simply two bilateral agreements. The effect of this arrangement was that Soluja acted as a broker and

---

**1.** The Uniform Commercial Code section relating to parol evidence provides:

"Terms with respect to which the confirmatory memorandum of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

U.C.C. § 2–202.

**2.** The parties are not agreed as to whether Missouri or New York law applies to the parol evidence question, nor as to whether the extrinsic evidence may itself be considered in the determination whether the writing expresses the parties total agreement. We need not decide these issues since, as noted in text, under either view we reach the same conclusion.

in that role undertook a broader range of risks in his relationship with Farmland than he undertook in his relationship with Oxon. It was Soluja who promised Oxon payment of the five containers once performance was completed, and it is Soluja to whom Oxon must look for contractual recovery. Conversely, since in its contract with Soluja Farmland acquired the right to withhold payment on five containers as liquidated damages for Soluja's breaches (and there is no question that Soluja breached its contract with Farmland), Farmland has no contractual obligation to pay Oxon for the five containers. In its contract with Soluja, Oxon acquired rights only vis-a-vis Soluja, not vis-a-vis Farmland.

■ While we are inclined to agree with Farmland's assertion of the parol evidence rule,[3] Oxon has asserted claims based on fraud and conversion and it is a generally accepted principle that the parol evidence rule is not to be strictly applied when such noncontractual claims are asserted. *See, e.g., Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir. 1978). Accordingly, we do not base our decision on the parol evidence rule. Never-

theless, even considering Oxon's evidence as to the discussions which took place at the meeting of the parties on June 12, 1974, Oxon has not met its burden of proof.

■ We found Oxon's witnesses and Farmland's witnesses on the subject of the June 12th meeting to be equally credible, and discern no basis for resolving the conflict in their testimony. Rather, it appears to us that the Oxon representatives at the meeting honestly believed that they had reached an agreement with both Soluja and Farmland as to the basis for their future relationships, and that the Farmland representatives honestly believed that their contractual undertaking would be solely with Soluja, who would make separate arrangements with Oxon. In these circumstances, it follows that, whatever the precise content of the discussions which took place, there was no meeting of the minds between Farmland and Oxon as to any obligations between them. As a result, the only contractual relations which actually resulted from the meeting were the bilateral contract between Oxon and Soluja and the bilateral contract between Farmland and

---

**3.** Farmland also asserts that Oxon's proffered evidence of an oral agreement between Farmland and Oxon is barred by the statute of frauds, which provides:

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2–606)."

U.C.C. § 2–201. We are persuaded, however, by Oxon's contention that even if the Farmland/Soluja and Oxon/Soluja writings do not satisfy the statute, the exception contained in § 2–201(3)(c) would apply because the five containers were received and accepted by Farmland.

Soluja. As discussed above, since Farmland was entitled to withhold payment on five containers because of Soluja's breaches of its contract with Farmland, Oxon is not entitled to recover the value of the containers from Farmland; since Oxon contracted only with Soluja, only Soluja is obligated to Oxon under the security provision of their agreement.

Similarly, Oxon has not established its claim for fraud. That claim rests on the argument that it was fraudulent for Soluja and Farmland to provide in their contract for liquidated damages when it had been allegedly agreed at the June 12th meeting of all *three* parties that payment on five containers would be withheld on a rolling forward basis only to ensure complete performance. However, since we find that no such tripartite agreement took place on June 12th, Farmland's agreement with Soluja for a more beneficial security agreement cannot be deemed fraudulent. It should be noted in this regard that the contract between Oxon and Soluja provided as a condition precedent that Soluja would reach agreement with Farmland on comparable terms. It may be true that Soluja's agreement with Farmland did not satisfy this term. Again, however, Farmland cannot be charged with the disparity. Oxon's remedy is to proceed against Soluja. Although this determination does not depend on the fact, nevertheless it is fair to note that Oxon did not request a copy of the agreement between Farmland and Soluja at the time, even though its contract with Soluja referred to the agreement and there was no evidence to suggest that Farmland took any action to keep the terms of its Soluja contract secret from Oxon. It thus appears that Oxon failed to protect its own interests if, as it asserts, it was determined that the Farmland/Soluja agreement would

reflect its agreement with Soluja with respect to the security agreement.

Oxon's claim that Farmland has been unjustly enriched at its expense is also without merit. Given Oxon's apparent remedy against Soluja, it cannot be said that Farmland has been unjustly enriched at Oxon's expense. Indeed, Farmland established that it was in fact injured by Soluja's breaches of the contract, and thus suffered no enrichment at all. For example, during the period from March to September, 1975, at least in part due to Oxon's suspension of shipments, Farmland was required to purchase some 700,000 pounds of atrazine from other sources, at prices considerably higher than its contract price with Soluja. Regardless of whether Farmland agreed with Oxon that the suspension was warranted by Soluja's duplicity, it remains the fact that Farmland did not receive the required product during this period because of Soluja's breach of contract.[4] In addition, Farmland was required to pay additional sums to the United States Customs office because of Soluja's breaches, and Farmland paid Soluja substantial sums in excess of the agreed contract price for atrazine while their relationship continued.

Nor is Oxon entitled to recover the value of the five containers under a theory of conversion. Farmland was entitled, under its contract with Soluja, to be relieved of its obligation of payment for the five containers. It cannot therefore be said to be guilty of exercising unauthorized dominion over the property since it was merely exercising its contractual remedies vis-a-vis Soluja. Oxon contends that Farmland's contract with Soluja cannot provide legal justification for its nonpayment because Oxon did not consent to or authorize Soluja to enter into the security agreement with Farmland. According to Oxon's theory of conversion,

---

4. Since Farmland's entitlement to retain the payment for the five containers as liquidated damages depended on breaches by Soluja, rather than Oxon, we need not decide whether Farmland acquiesced in Oxon's suspension of shipments in 1975, since any such acquiescence has no affect on its rights vis-a-vis Soluja. In addition, there was much dispute between the parties as to whether Farmland was actually injured by the suspension of shipments in rela-

tion to its selling season. The unchallenged testimony that Farmland bought additional atrazine during this period at higher prices supports Farmland's assertion of damage. Moreover, Farmland need not have proved its precise measure of damage since the very purpose of a liquidated damage provision is to avoid such a burden. It is sufficient for purposes of this analysis that Farmland's injuries were not insignificant.

Soluja was its agent and Soluja exceeded its authority when it entered into the liquidated damage agreement with Farmland because Soluja thereby pledged Oxon's property on Soluja's behalf without Oxon's consent. However, even assuming the relevance of an agency analysis in this kind of transaction, Oxon has presented no evidence from which it could be inferred that Farmland knew or should have known of the asserted limits on Soluja's authority. Soluja represented to Farmland, as evidenced by the written contract, that it was Oxon's exclusive sales agent for North America, and thus Farmland could reasonably rely on Soluja's authority to enter into the contract with Farmland. And, as noted above, Oxon's failure to procure a copy of the Farmland/Soluja contract to ensure that its agent was acting within the bounds of authority cannot be charged against Farmland, which had no reason to suspect that Soluja was exceeding its authority. Moreover, the structure of the parties' relationship suggests that Soluja was not Oxon's agent in the traditional sense of an entity acting at another's direction for another's benefit, but rather was a broker in atrazine who independently procured a supply of the product and found buyers for the product. Therefore, it was not Oxon's property which was pledged, but rather Soluja's contractual right to receive payment under its agreement with Farmland. The separate bilateral contracts support this view of the matter and stand in contrast to Oxon's agency analysis.

Finally, Oxon's claims with respect to the increased costs of raw materials and currency indexation are also dismissed. Oxon's contention that Farmland is obligated to pay these sums under the June 12th agreement is foreclosed by the finding that no such agreement was reached between Oxon and Farmland. Oxon's argument that Farmland is equitably estopped from denying its obligation to pay these sums on the basis of Farmland's purported representations in 1975 that it would withhold these payments from Soluja and transmit them directly to Oxon is unpersuasive in view of the total lack of evidence that Oxon detrimentally relied on the representations.

Oxon has identified no conduct which it took, or would have taken, but for the asserted representations. Moreover, we are inclined to believe that, like the purported oral agreement of June 12, 1974, the parties did not reach a meeting of the minds on this issue, either. This view is confirmed by the fact that, at the time of their discussions with the Oxon personnel on this matter, the Farmland representatives had apparently not yet consulted their attorney on the matter. Since the proposed action could readily be seen as a breach of Farmland's contract with Soluja, it makes sense that the Farmland representatives, who appeared at trial and in their other actions in this dispute to conduct themselves cautiously in matters involving potential legal conflict, would not agree to direct payment without consultation with Farmland's attorneys. It is clear that when the attorneys were consulted, Farmland decided against direct payment without judicial authorization, and instead suggested that Oxon seek to attach the funds they contended were owed by Soluja.

\*   \*   \*   \*   \*   \*

Oxon's claims against Farmland are dismissed.

Submit judgment.